IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14–cv–03228–REB–KMT

ANTHONY AMATO, an individual, and
AMEGA SCIENTIFIC CORPORATION, a New Jersey corporation,

    Plaintiffs,

v.

MESA LABORATORIES, INC., a Colorado corporation,

    Defendant.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

**Magistrate Judge Kathleen M. Tafoya**

    This case comes before the court on Defendant Mesa Laboratories "Motion to Dismiss the Complaint." (Doc. No. 16, filed Jan. 20, 2015.) For the following reasons, the court RECOMMENDS that Defendant's Motion to Dismiss be GRANTED in part and DENIED in part.

**FACTUAL BACKGROUND**

    The following facts are taken from Plaintiff's Complaint (Doc. No. 1) and are presumed to be true for purposes of this Recommendation.

    In 1999, Plaintiff Anthony Amato founded Amega Scientific Corporation ("Amega") as a start-up company. (Compl. ¶ 7.) Amega produced products and provided services to companies for the purpose of monitoring environmental parameters such as temperature, humidity, carbon

dioxide, oxygen, differential pressure, voltage, and air flow. (*Id.*) These types of products and services are generally referred to as "centralized monitoring systems." (*Id.*)

Over the next ten years, Amega became a leading provider of centralized monitoring systems and, by 2013, Amega was widely recognized within the industry as one of the most profitable and successful companies of its kind. (*Id.* ¶ 8.) Amega attributed its success primarily to Mr. Amato, its President, and his understanding of the centralized monitoring systems market, strong customer relations, and strategic business decisions. (*Id.* ¶ 9.)

In April 2013, John Sullivan, the Chief Executive Officer of Defendant Mesa Laboratories, Inc. ("Mesa"), approached Mr. Amato on behalf of Mesa with an offer to purchase Amega. (*Id.* ¶ 10.) Over the course of the next seven months, Sullivan and other Mesa representatives discussed and negotiated the structure of the proposed purchase of Amega by Mesa. (*Id.* ¶ 12.) During the negotiations, Mr. Sullivan and Mesa's Vice President, Glenn Adriance, stated that a key element of Mesa's post-acquisition plan was for Mr. Amato to serve as Mesa's Director of Environmental Sales, due to his industry knowledge and longstanding customer relationships.[1] (*Id.* ¶ 13.)

On October 14, 2013, Mr. Adriance reiterated at a meeting with Mr. Amato that he would lead the "New Mesa" sales effort. (*Id.* ¶ 18.) The following day, October 15, 2013, Mr. Adriance distributed a "go to market" corporate organizational chart depicting the intended corporate leadership structure after Mesa's acquisition of Amega. (*Id.* ¶ 19.) The organization

---

[1] Mesa also represented that it intended to acquire TempSys, Inc., a company that manufactured centralized monitoring systems products, at the same time it acquired Amega. (*Id.* ¶ 14.) By simultaneously acquiring TempSys and Amega, Mesa planned to create a new environmental monitoring division, over which Amato would be the sales director. (*Id.*)

2

chart identified Mr. Amato as the Director of Environmental Sales reporting directly to Mr. Adriance and in charge of overseeing at least ten lower-level employees. (*Id.*)

Over the course of negotiations, Mesa also provided Amato with several Letters of Intent documenting the proposed structure of Mesa's purchase of Omega. (*Id.* ¶ 23.) The Letters of Intent proposed various combinations of a purchase price that would include an up-front cash payment and post-acquisition payments in the form of earn-out payments and stock options. (*Id.*)

On or about November 1, 2013, Mr. Adriance asked Mr. Amato to sign the Mesa Sales Commission Plan for the remainder of fiscal year 2014, which detailed the compensation and commission structure that would apply to Mr. Amato's position as Mesa's Director of Environmental Sales. (*Id.* ¶ 24.) The Sales Commission Plan provided that Amato would be entitled to a monthly commission of 0.75% of Mesa's centralized monitoring system sales, which Mesa estimated would be approximately $43.5 million per year. (*Id.* ¶ 25.) Additionally, Mesa told Mr. Amato he would receive a "Senior Management Bonus" at the end of March in the amount of approximately $10,000. (*Id.* ¶ 25.)

Mr. Amato ultimately agreed to sell Amega to Mesa. Pursuant to an Asset Acquisition Agreement entered on November 6, 2013 (the "Purchase Date"), Mesa acquired 100% of Amega's assets in exchange for in exchange for: (1) an upfront payment of $10 million; (2) the assumption of certain Amega liabilities; (3) a future payment of $1 million, subject to adjustment for certain losses, payable one year from the Purchase Date (the "Holdback Amount"); and (4) a future payment, up to a maximum of $10 million (the "Earn-Out Payment") as set forth in a

separate and contemporaneously executed Earn-Out Agreement. (Compl., Ex. 3 § 2.5 ["Acquisition Agmt."].)

The Earn-Out Agreement provides that the Earn-Out Payment is to be calculated based on Mesa's revenues for the 3-year period from November 6, 2013 through November 5, 2016 (the "Earn-Out Period"). (Compl., Ex. 1 § 1(a) ["Earn-Out Agmt."].) Mesa is to determine a Proposed Earn-Out Payment within thirty days after the expiration of the Earn-Out Period; then Amega is provided with the opportunity to determine if Mesa properly calculated the proposed Earn-Out Payment. (*Id.* § 1(b)(1)-(2).) Mesa is obligated to pay Amega the Earn-Out Payment within ten days after the amount of the Earn-Out Payment is finally resolved. (*Id.* § 1(b)(5).) Mesa is also required to "use its commercially reasonable best efforts to grow, market and develop the Business" during the Earn-Out Period. (*Id.* § 6(b).)

On the Purchase Date, Mr. Amato and Mesa also executed a Non-Qualified Stock Option Agreement. (Compl., Ex. 2 ["Stock Option Agmt."].) The Stock Option Agreement afforded Mr. Amato an opportunity to purchase an aggregate of 10,000 shares of Mesa stock at the price of $67.81 per share over a fixed period of time. (*Id.* § 1, 3, 4.) The Stock Option Agreement provides that Mr. Amato had the right to exercise the stock option so long as he had "been in the continuous employ or service of [Mesa] . . . from [November 6, 2013] to the date of the exercise of the Option." (*Id.* § 4.) Further, Mr. Amato was not permitted to exercise any stock options within the first year after the Stock Option Agreement was executed. (*Id.*)

On the Purchase Date, Mr. Amato immediately commenced his role as an employee of Mesa in the capacity of Director of Environmental Sales. (Compl. ¶ 34.) Just over two months

later, on January 24, 2014, Mr. Adriance informed Mr. Amato that the Director of Environmental Sales position had been eliminated and that, as a consequence, Mr. Amato was terminated effective immediately. (*Id.* ¶ 37.) Based on the date of his termination, Mr. Amato was foreclosed from exercising his stock option under the Stock Option Agreement. (*Id.* ¶¶ 39-41.)

## PROCEDURAL HISTORY

Based on the facts above, Plaintiffs' Complaint, filed November 25, 2014, asserts state law claims on behalf of Amega and Mr. Amato for (1) fraud; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of contract; and (4) unjust enrichment. (*See* Compl.) The Complaint also asserts a claim on behalf of Mr. Amato for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (*Id.* ¶¶ 52-60.)

In its Motion to Dismiss, Mesa confesses that Plaintiffs' breach of contract claim states a claim to the extent it alleges that Mesa breached the Acquisition Agreement by improperly deducting certain losses from the Holdback Amount, therefore conceding that the case will proceed forward on at least this claim. Nevertheless, Mesa maintains that the remaining claims in Plaintiffs' Complaint fail to state a claim upon which relief can be granted. (*See* Mot. Dismiss.) Plaintiffs' Response in Opposition was filed on February 13, 2015 (Doc. No. 18) and Mesa's Reply was filed on March 2, 2015 (Doc. No. 24).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6)

(2007). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id*. at 679-81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

## ANALYSIS

### 1. *Claims One and Two*

Mesa argues that Plaintiffs' first and second claims for fraud and violations of Section 10(b) of the Securities Act fail to state a claim because Plaintiffs fail to alleged fraud with particularity under Federal Rule of Civil Procedure 9(b) and because all of Mesa's alleged fraudulent statements concerned nonactionable future events. The court agrees.

To state a claim for fraud under Colorado law, a plaintiff must allege: (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) damage caused by the representation. *Ballow v. PHICO Ins. Co.,* 875 P.2d 1354, 1361 (Colo. 1993) (citing *Kinsey v. Preeson,* 746 P.2d 542, 550 (Colo. 1987)). Similarly, to state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) the defendant made an untrue or misleading statement of material fact; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with

7

scienter, that is with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1095 (10th Cir. 2003).

Notably, both of these claims are subject to the heightened pleading standards of Rule 9(b). Fed. R. Civ. P. 9(b) ("In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud . . . ."). The primary purpose of Rule 9(b) is "to afford defendant fair notice of plaintiff's claim and the factual ground upon which it is based." *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 987 (10th Cir. 1992); *see also Seattle-First Nat'l Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir. 1986) (Rule 9(b)'s requirements must be read in conjunction with the pleading requirements of Rule 8). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield,* 472 F.3d 702, 726-27 (10th Cir. 2006); *see also Lawrence Nat'l Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 180 (10th Cir. 1991) (a complaint must set "forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof.").

According to Plaintiffs' Response, the crux of their fraud and Section 10(b) claims is that "Mesa represented that Amato would be Mesa's Director of Environmental Sales on a long-term basis." (Resp. at 9 (citing Compl. ¶ 28).) However, nowhere in this Complaint is the longevity of the employment arrangement actually alleged.[2] Moreover, even if this allegation were

---

[2] Paragraph twenty eight of the Complaint alleges only that "Amato reasonably believed that Mesa was sincere about its stated intent to employ Amato in an upper-management capacity on a long term-basis after the acquisition" (Compl. ¶ 28); it does not allege that any Mesa representative affirmatively made such a statement.

scienter, that is with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1095 (10th Cir. 2003).

Notably, both of these claims are subject to the heightened pleading standards of Rule 9(b). Fed. R. Civ. P. 9(b) ("In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud . . . ."). The primary purpose of Rule 9(b) is "to afford defendant fair notice of plaintiff's claim and the factual ground upon which it is based." *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 987 (10th Cir. 1992); *see also Seattle-First Nat'l Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir. 1986) (Rule 9(b)'s requirements must be read in conjunction with the pleading requirements of Rule 8). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield,* 472 F.3d 702, 726-27 (10th Cir. 2006); *see also Lawrence Nat'l Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 180 (10th Cir. 1991) (a complaint must set "forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof.").

According to Plaintiffs' Response, the crux of their fraud and Section 10(b) claims is that "Mesa represented that Amato would be Mesa's Director of Environmental Sales on a long-term basis." (Resp. at 9 (citing Compl. ¶ 28).) However, nowhere in this Complaint is the longevity of the employment arrangement actually alleged.[2] Moreover, even if this allegation were

---

[2] Paragraph twenty eight of the Complaint alleges only that "Amato reasonably believed that Mesa was sincere about its stated intent to employ Amato in an upper-management capacity on a long term-basis after the acquisition" (Compl. ¶ 28); it does not allege that any Mesa representative affirmatively made such a statement.

included in the Complaint, it would fail to meet Rule 9(b)'s pleading requirements as Plaintiffs do not specify which Mesa representative made this representation, or when, where, and how it occurred.

Ultimately, the only allegations that arguably meet Rule 9(b)'s specificity requirement as to the duration of Mr. Amato's employment at Mesa are (1) that Mr. Sullivan and Mr. Adriance conveyed that "a key element of Mesa's post-acquisition plan was that Amato would serve as a top-level employee of Mesa after the acquisition, specifically as the Director of Environmental Sales" (Compl. ¶ 13) and (2) that Mr. Adriance reiterated to Mr. Amato that "he would lead the 'New Mesa' sales effort" (*id.* ¶ 18).  Even construing these allegations in a light most favorable to Plaintiff, neither statement amounts to a representation from Mesa or its representatives that Mr. Amato "would become a *long-term* top-level management employee of Mesa."  (Compl. ¶ 45) (emphasis added).

As a consequence, to the extent that Mr. Amato relied on these statements to conclude that he would be employed by Mesa on a long-term basis or for any specified time period after the acquisition, his reliance was not reasonable.  Indeed, on top of the fact that Plaintiffs' own allegations demonstrate that no Mesa representative ever assured Mr. Amato that he would be employed for a specific length of time, his reliance is further undercut by the fact that the Acquisition Agreement specifically provides that any employment offered by Mesa is "at will" and post-acquisition employees may be terminated by Mesa "at any time for any reason." (Acquisition Agmt. § 5.7(c).)

Plaintiffs' fraud claim also alleges that Mesa represented that "as the Director of Environmental Sales, Amato would likely earn substantial commissions on top of his base salary." (Compl. ¶ 45.) As an initial matter, even assuming Mesa made such a statement, it does not constitute an actionable misrepresentation. Under Colorado law, it is well-settled "that one of the essential elements of fraud and deceit is that there be a false representation of material fact, which fact either exists in the present or has existed in the past; and, conversely, that a mere expression of an opinion in the nature of a prophecy as to the happening or non-happening of a future event is not actionable." *Leece v. Griffin,* 371 P.2d 264, 265 (Colo. 1962) *accord Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 921 (Colo. App. 1991). To be sure, in limited circumstances, a "promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud." *Kinsey v. Preeson,* 746 P.2d 542, 551 (Colo. 1987) (citation omitted). However, even as framed by Plaintiffs, Mesa's alleged representation that Mr. Amato would *likely* earn substantial commissions in his role as Director of Environmental Sales amounted to an opinion or prophecy, not a concrete promise.

More importantly, the Complaint does not allege that Mesa promised Mr. Amato that he would earn certain commissions in a manner sufficient to meet Rule 9(b). First, although Plaintiffs allege that Mesa told Mr. Amato "he would receive a Senior Management Bonus at the end of March in the amount of approximately Ten Thousand Dollars" (Compl. ¶ 26), there are no allegations as to who made this representation, or when, where, and how it occurred. Second, although Mr. Adriance provided Mr. Amato with the Mesa Sales Commission plan for the

remainder of fiscal year 2014, Plaintiffs do not allege that he made any contemporaneous statement assuring that Mr. Amato would receive the commissions described therein.[3]

Finally, Plaintiffs' fraud and Section 10(b) claim both allege that Mesa represented to Mr. Amato that he would have the right under the Stock Option Agreement to exercise his option to purchase up to 10,000 shares of Mesa's common stock at a favorable purchase price. However, once again, the Complaint is devoid of any specific statement from a Mesa representative guaranteeing Mr. Amato that he would be able to exercise some or all of the stock options provided for in the Stock Option Agreement. Indeed, it appears that this claim is premised solely on the fact that the parties executed the Stock Option Agreement, which clearly provides that Mr. Amato would not be able to exercise any stock options prior to November 6, 2014, would not be able to exercise all 10,000 stock options prior to November 6, 2017, and, even then, only if he had been in Mesa's continuous employ or service through the exercise date. (Stock Option Agmt. § 4.) *See also Haynes Trane Serv. Agency v. Am. Standard, Inc.,* 573 F.3d 947, 962 (10th Cir. 2009) (economic loss rule bars tort claims where the duty arises from a relevant contract). The unfortunate fact of the matter is that Mr. Amato simply failed to protect himself contractually from losing his ability to exercise his stock options in the event of his early

---

[3] Plaintiffs' also allege that Mesa represented to Mr. Amato that "as the Director of Environmental Sales, [he] would have a direct role in ensuring that Mesa's growth met the benchmark required for [him] to earn the maximum earn-out of $10 Million under the Earn-Out Agreement." (Compl. ¶ 45.) However, there are no allegations that any Mesa representative made this representation to him; instead, based on his role as the Director of Environmental Sales and the control he would have over Mesa's business decisions and strategy, Mr. Amato *believed* that Mesa's *projected* post-acquisition success was reasonable. Moreover, even if a Mesa representative made a statement regarding the likelihood Mr. Amato would earn the maximum Earn-Out Payment, it would amount to nonactionable prophecy, rather than an actionable promise.

11

termination – a provision which was available to him and which easily could have been included in the Acquisition Agreement and/or in the Stock Option Agreement, but was not.

Ultimately, the court finds that Plaintiffs' first claim for fraud and second claim for violations of Section 10(b) of the Securities Act fail to state a claim for relief. Accordingly, the court finds that Mesa's Motion to Dismiss is properly granted as to these claims.

*2. Claim Three*

Plaintiffs' third claim alleges that Mesa breached the duty of good faith and fair dealing by (1) intentionally misrepresenting material facts to Amato and Amega to induce them to sell Amega to Mesa and enter into the Acquisition Agreement, Earn-Out Agreement, and Stock Option Agreement, and (2) terminating Mr. Amato without cause prior to his ability to purchase any shares of stock under the Stock Option Agreement. (Compl. ¶¶ 64, 65.) The court finds that Plaintiff fails to state a claim under either theory.

Every contract contains an implied duty of good faith and fair dealing. *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995). The duty applies "when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time." *Id.* (citation omitted). However, the duty of good faith and fair dealing cannot be used to contradict explicit terms or conditions of the contract. *Id.*

First, to the extent that Plaintiff's third claim is premised on Mesa's alleged misrepresentations that induced them to sell Amega, it fails as a matter of law. The duty of good faith and fair dealing applies only to the performance of the contract; it does not govern pre-contractual negotiations or representations. *See Amoco Oil Co. v. Ervin,* 908 P.2d at 498 (The

12

covenant of good faith and fair dealing "may be relied upon only when the manner of *performance* under a specific contract term allows for discretion on the part of either party.") (emphasis added); *Blixseth v. Cushman & Wakefield of Colo., Inc.,* No. 12-cv-00393-PAB-KLM, 2013 WL 5446791, at *11 (D. Colo. Sept. 30, 2013) (citing *Story v. City of Bozeman,* 791 P.2d 767, 775 (Mont. 1990) (applying Montana law and concluding that the covenant of good faith and fair dealing "focuses on the performance of the contract, and not on pre-contractual misrepresentations"); *URS Group, Inc. v. Tetra Tech FW, Inc.,* 181 P.3d 380, 391 (Colo. App. 2008) (collecting cases for purposes of applying New Jersey law and finding that "there is no cause of action for breach of the duty of good faith and fair dealing during contract negotiations"). [4]

Second, Plaintiffs' third claim fails to the extent it is premised on Mesa terminating Amato before he was able to exercise stock options under to Stock Option Agreement. As discussed above, the Acquisition Agreement explicitly provides that post-acquisition employment offered by Mesa is "at will" and that Hired Employees may be terminated by Mesa . . . at any time." (Acquisition Agmt. § 5.7(c).) The Stock Option Agreement did not modify Mr. Amato's "at will" employment and instead specifically provided that Mr. Amato must be in the continuous employ or service of Mesa to exercise any stock option. As such, finding that Mesa

---

[4] Moreover, even if the duty of good faith and fair dealing did apply to misrepresentations during pre-contractual negotiations, applying it to Mesa's pre-contractual representations would modify the terms of the Acquisition Agreement, which explicitly provides that Mesa made no representations outside of the Agreements and that Amega expressly disclaims "any warranty regarding Mesa's business, including, but not limited to, any warranty of future business performance." (Acquisition Agmt. § 3.8.)

13

had a good-faith duty not to terminate Mr. Amato absent cause would modify the explicit terms of the Acquisition and Stock Option Agreements. Most importantly, Colorado does not recognize an implied covenant of good faith and fair dealing in employment contracts. *Marsh v. Delta Airlines, Inc.,* 952 F. Supp. 1458, 1465 (D. Colo. 1997) (citing *Farmer v. Cent. Bancorporation, Inc.,* 791 P.2d 220, 222 (Colo. App. 1988)).

Accordingly, the court finds that Plaintiffs fail to state a claim for breach of the duty of good faith and fair dealing. As such, the court finds that Mesa's Motion to Dismiss is properly granted with respect to claim three.

### 3. *Claim Four*

As a threshold matter, Plaintiffs' fourth claim for breach of contract alleges that Mesa violated the Acquisition Agreement, Earn-Out Agreement, and Stock Option Agreement by "knowingly and intentionally . . . distorting the true value of the non-cash portion of the Consideration paid by Mesa in exchange [sic] the sale of Amega's assets, and by then shortly thereafter terminating Amato." (Compl. ¶ 75.) However, as discussed above with respect to Plaintiffs' good faith and fair dealing claim, the Acquisition Agreement specifically provides that post-acquisition employment offered by Mesa is "at will" and that Hired Employees may be terminated by Mesa . . . at any time." (Acquisition Agmt. § 5.7(c).) Similarly, the Stock Option Agreement expressly provides that Mr. Amato could only exercise his stock options so long as he was employed by Mesa and does not contain any limitations on Mesa's right to terminate Mr. Amato's "at will" employment. As such, to the same extent Plaintiffs have failed to state a claim

for breach of the *implied* duty of good faith and fair dealing, Plaintiffs have failed to state a claim for a violation of any *explicit* provision of the Acquisition Agreement.

Plaintiffs' breach of contract claim also alleges that Mesa breached (1) the Acquisition Agreement by improperly deducting certain losses from the Holdback Amount and (2) the Earn-Out Agreement's requirement to use commercially reasonable efforts to grow, market, and develop the business by terminating Mr. Amato, the only management-level Mesa employee with first-hand knowledge of the centralized monitoring systems market. Mesa concedes that Plaintiffs allegations regarding the Holdback Amount state a claim, but argues that Plaintiffs' allegations as to breach the Earn-Out Agreement are not yet ripe. The court disagrees.

A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. *Texas v. United States,* 523 U.S. 296, 300 (1998). Mesa appears to argue that, even if its termination of Mr. Amato breached the Earn-Out Agreement's requirement that it use "commercially reasonable best efforts to grow, market, and develop the Business" (Earn-Out Agmt. § 6(b)), Plaintiffs cannot show any resultant damages because the Earn-Out payment is not due until 30 days after the conclusion of the Earn Out Period—or December 5, 2016.

Colorado law, however, permits a party to maintain a cause of action for an immaterial breach of contract, although the only remedy for such a breach is nominal damages. *CollectACheck, Inc.,* v. *Check Collection Recovery, Inc.,* No. 09-cv-00186-DME-KMT, 2009 WL 1279329, at *5 (D. Colo. May 6, 2009) (citing *Interbank Inv. , LLC v. Eagle River Water & Sanitation Dist.,* 77 P.3d 814, 818 (Colo. App. 2003)); *see also City of Westminster v. Centric-*

*Jones Constructors,* 110 P.3d 472, 481 (Colo. App. 2003) *accord Regency Realty Investors, LLC v. Cleary Fire Protection, Inc.,* 260 P.3d 1, 6 (Colo. App. 2009) (nominal damages are recoverable for a breach of contract even if no actual damages resulted).  Thus, Plaintiffs need not allege actual damages to pursue their breach of contract claim against Mesa.  *Salt Lake Tribune Publishing Co. v. Mgmt. Planning, Inc.,* 454 F.3d 1128 (10th Cir. 2006) (citing *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 477 A.2d 1224, 1228 (N.J. 1984)) (finding breach of contract claim under New Jersey law was ripe because  proof of actual damages is not an element of a breach of contract claim); *see also Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.,* 958 F. Supp. 2d 507, 518 (under New York law, "a breach of contract case . . . is ripe immediately upon the [alleged] breach, even where damages remain uncertain.") (citation omitted).  Thus, while Plaintiffs may not be able to prove that they suffered actual damages as a result of the alleged breach of the Earn-Out Agreement prior to December 5, 2016, their claim is nevertheless ripe.

Accordingly, while the court finds that while Plaintiffs' breach of contract claim fails to the extent it is premised on Mr. Amato's termination, Plaintiffs' breach of contract claim is ripe to the extent it is premised on an alleged violation of § 6(b) of the Earn-Out Agreement. Therefore, Mesa's Motion to Dismiss should be granted in part and denied in part with respect to Plaintiffs' breach of contract claim.

### 4.    *Claim Five*

Defendants argue that Plaintiffs' fifth claim for unjust enrichment fails because of the existence of the Acquisition Agreement. The court agrees.

Plaintiffs allege that Mesa was unjustly enriched by purchasing Amega for less than the amount it would have sold for in the absence of illusory promises. (Compl. ¶ 83.) However, "[i]n general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Inv.,* 77 P.3d at 816. Here, the Acquisition Agreement covers precisely the same subject matter as Plaintiffs' unjust enrichment claim—the sale of Amega's assets to Mesa. Accordingly, the Acquisition Agreement precludes Plaintiffs' unjust enrichment claim.

WHEREFORE, for the foregoing reasons, court respectfully

**RECOMMENDS** that Defendant Mesa Laboratories "Motion to Dismiss the Complaint." (Doc. No. 16) be DENIED in part. Specifically, the court RECOMMENDS that the Motion to Dismiss be DENIED as to Plaintiffs' breach of contract claim to the extent that claim alleges a breach of the Earn-Out Agreement[5] and GRANTED in all other respects.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will

---

[5] As discussed above, Plaintiffs' breach of contract claim is also viable to the extent it alleges that Mesa improperly deducted certain losses from the Holdback Amount and the case would proceed forward both theories.

not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 14th day of August, 2015.

BY THE COURT:

_____
Kathleen M Tafoya
United States Magistrate Judge